TARGET STORES, Respondent-Appellant, v. RUTH THORNTON, Petitioner-Appellee.

Fifth District (Industrial Commission Division)   No. 5—87—0263WC

Opinion filed February 22, 1988.

William L. Rogers, of Keefe & DePauli, P.C., of Fairview Heights, for appellant.

Daniel J. Hayes, of Hayes, Murphy & Hayes, of Belleville, for appellee.

JUSTICE MCNAMARA delivered the opinion of the court:

Claimant Ruth Thornton sought worker's compensation benefits for injuries allegedly sustained while working for the employer Target Stores. An arbitrator awarded $105.50 per week for 10²/₇ weeks as temporary total disability for a leg injury. The Industrial Commission affirmed this part of the arbitrator's decision.

The arbitrator also awarded claimant $93.33 per week for 30 weeks for the permanent loss of the use of her left leg to the extent of 15%. The Commission modified this allowance, and awarded claimant $93.33 per week for 10 weeks as permanent partial disability to the extent of loss of 5% of the use of her left leg.

The Commission affirmed the arbitrator's award of $4,134.07 for necessary medical expenses.

The arbitrator further awarded claimant $93.33 per week for 75 weeks as permanent partial disability to the extent of 15% in the form of continued swelling and pain in her feet and hands, and uveitis in her left eye. The Commission reversed this portion of the award, finding claimant failed to prove a causal relationship between the work accident and her rheumatoid arthritis or eye inflammation.

The circuit court of Madison County reversed the Commission's decision, finding it to be against the manifest weight of the evidence. The court reinstated the decision of the arbitrator, and the employer appeals.

On November 19, 1979, claimant worked as a stock clerk for Target. On that day, she stood on a ladder, putting boxes on a shelf, when she lost her balance. As she started to fall, she caught herself, twisting or jerking her body to grab the shelf. She felt muscles pulled in her back. "[A]nd I noticed I had, you know, from the jerk of the position of my feet, my left leg or whatever it was it was in, I had a sharp pain in there ***." Several days later she began experiencing more pain in her left big toe, which was swollen and purple. She saw Dr. Parich, the company physician, who diagnosed a badly sprained big toe on the left foot. Claimant denied experiencing any problems with regard to her feet or legs prior to November 19, 1979.

Between 1979 and 1983, claimant at times worked either part time or full time, and at times did not work at all. During that period she sought medical advice and treatment from various physicians who diagnosed rheumatoid arthritis. In late August 1982, claimant developed a problem with her left eye. Dr. D. Raghunanda diagnosed anterior and posterior uveitis in the left eye. He thought the arthritis might have caused the ocular condition since no other etiology was apparent.

On appeal, the employer contends that the trial court erred in reversing the decision of the Commission because that decision was supported by the evidence. The issue of causal connection in this case rests upon the credibility of various medical records and opinions. The Commission alone must weigh the evidence, determine the credibility of the witnesses, and resolve conflicting medical opinions. (*Interlake, Inc. v. Industrial Comm'n* (1983), 99 Ill. 2d 69, 457 N.E.2d 415.) The Commission's conclusions on these questions will not be disturbed unless they are contrary to the manifest weight of the evidence. (*Odie v. Industrial Comm'n* (1982), 88 Ill. 2d 514, 431 N.E.2d 374.) While different conclusions could be drawn from the evidence, we cannot say that the findings of the Commission are against the manifest weight of the evidence.

Claimant's treating physician was Dr. Luis Anglo. In finding no causal connection, the Commission was entitled to rely on the fact that Dr. Anglo's records showed that he examined claimant on the day of the accident, yet noted no report of an accidental injury sustained earlier that day. Claimant testified that she saw Dr. Anglo that day because of a bladder infection and that she did not mention the accident. At the time, she was primarily concerned with the bladder infection. Dr. Anglo noted discussing several medical problems with claimant on that day, and diagnosed upper respiratory tract infection, severe rhinitis, myalgia, and rheumatoid arthritis.

On November 30, 1979, Dr. Anglo admitted claimant to the hospital with complaints of abdominal pain and black stools. Dr. Anglo noted in the hospital records that claimant stated that she was in good health one or two weeks prior to her admission. The December 7, 1979, hospital discharge report recites a diagnosis of a severe sprain of the left foot.

In a report dated August 25, 1980, Dr. Anglo reported that in November 1979 he had made a possible diagnosis of rheumatoid arthritis. A November 1979 hospital record shows that a laboratory test for rheumatoid arthritis was performed, and the results were negative. Claimant testified that Dr. Anglo never treated her for rheumatoid arthritis prior to November 19, 1979. Thus, in determining whether the work accident caused the onset of the arthritis, the Commission was entitled to draw any reasonable inference from the fact that on the day of the work accident, Dr. Anglo tentatively diagnosed rheumatoid arthritis, but reported no history of a work accident.

Claimant relies upon the testimony of Dr. Kilian F. Fritsch, an orthopedist and a treating physician. Dr. Fritsch testified at a deposition that he first examined claimant on January 7, 1980. He hospital-

ized her for tests and diagnosed rheumatoid arthritis and a sprained left big toe. The laboratory test was consistent with rheumatoid arthritis. When he examined her in February 1981, he saw a "little thickening of the synovium of the left knee and a little positive drawer sign from laxity of the anterior cruciate. That's all. That is the only permanency that I find at this time." Dr. Fritsch offered the only medical opinion as to causation. He opined that there was "a causal connection between her alleged injury and the ill-being that she suffered." Dr. Fritsch also stated that the pain and emotional stress of her injury, and a viral infection, either caused or aggravated her condition of rheumatoid arthritis.

The trial court stated that Dr. Fritsch "established to within a reasonable degree of medical certainty that the injury at the workplace on November 19, 1979, precipitated a manifestation of rheumatoid arthritic symptoms."

The Commission was entitled, however, to consider Dr. Fritsch's uncertainty as to the cause of the rheumatoid arthritis. Dr. Fritsch stated, "Now, whether this could have been from the time she got the leg caught in the ladder and twisted it or whether it is from her rheumatoid arthritis I don't know. And I say this falling or injury was probably an aggravation or precipitating factor in the flare-up of this arthritis superimposed, of course, on this viral infection which was present at the same time." The basis of his opinion was that "all of her problems started at that time."

Dr. Fritsch testified further that rheumatoid arthritis is usually seen in women under 33, and that its onset is linked to many factors, including anxiety, stress, normal changes, or trauma. It is possible to develop the condition from a virus alone. Dr. Fritsch was unable to state whether the trauma in November 1979 was the aggravating factor which caused the arthritis. "Well, she may never have had the arthritis except that the conditions were just right, that is the viral infection plus the injury plus the anxiety and the pain and so forth." Dr. Fritsch also stated, "Well, unless the trauma, and who knows on this and no one can say, was the thing that started it out—***." Dr. Fritsch also explained that generally the cause of rheumatoid arthritis remains uncertain. Moreover, the disease moves into remission but can repeatedly manifest itself later. Thus, he could not conclude with any certainty that claimant's trauma in November 1979 caused the aggravation of her rheumatoid arthritis.

Significantly, Dr. Fritsch indicated on cross-examination that his opinion as to causation might change if claimant had failed to report the accident to Dr. Anglo when she saw him the same day. "Well, of

course, if she came in to see [Dr. Anglo on the day of the accident] and, I don't know what symptoms she gave him or what—but if they were—if she gave no history of injury, I don't know how to explain it. *** It might have been the beginning at that point. Do you know as to why she did not tell him about the injury?" Dr. Fritsch agreed that if the arthritis had been diagnosed on November 19, 1979, then the trauma was only incidental. Dr. Fritsch emphasized that his opinion as to causation only remained the same "if what she told me was correct, the story I received was correct." He stated that claimant reported experiencing no problems prior to the accident. The Commission could properly assign little weight to Dr. Fritsch's opinion regarding causation.

The trial court relied upon the testimony of Dr. George Scheer, an orthopedic surgeon, whose evidence deposition was presented to the Commission on review. The trial court found that Dr. Scheer's testimony "supported the conclusion that a traumatic event would exacerbate a condition of rheumatoid arthritis," and the court relied upon the fact that Dr. Scheer did not challenge Dr. Fritsch's finding as to causal connection.

At the request of the employer, Dr. Scheer examined claimant on November 15, 1982, for pain in her right knee and treated her eye inflammation. Dr. Scheer testified that the examination revealed negative findings and that claimant manifested no objective abnormalities. She showed no swelling in her joints, including her knee and the small joints of her fingers. The knee was stable; the cruciate collateral ligaments were intact; she had full range of motion of the knee; and there was no edema in the legs. He concluded that no orthopedic treatment was indicated, including either conservative or surgical management. Dr. Scheer also explained that rheumatoid arthritis is characterized by remissions and exacerbation. Dr. Scheer's testimony, therefore, did not compel a decision contrary to that of the Commission.

The Commission also properly noted that claimant testified on review that except for some eye treatment, she had received no further treatment for her hands or feet since the arbitration hearing one year earlier.

We conclude that the Commission's decision that claimant failed to prove a causal connection between the accidental injury of November 19, 1979, and her eye inflammation and rheumatoid arthritis is supported by the evidence and should not be disturbed.

■ Claimant relies on *Quick v. Industrial Comm'n* (1972), 53 Ill. 2d 46, 289 N.E.2d 617, for the proposition that it was inconsistent for

the Commission to allow all medical expenses, but deny the additional disability awards made by the arbitrator. In *Quick*, the court was faced with a situation opposite to that presented here. The Commission had allowed the employee temporary total disability compensation for a period of time when he was hospitalized for surgery, but had disallowed medical expenses for the surgery. The court held that the decision to disallow medical expenses and permanent disability award allowed by the arbitrator was inconsistent and against the manifest weight of the evidence. In contrast, in the present case the Commission awarded both temporary total disability and permanent disability benefits. It is not inconsistent, therefore, for it to also award all related medical expenses.

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed, and the Commission's decision is reinstated.

Judgment reversed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and CALVO, JJ., concur.